T.C. Memo. 1996-399


UNITED STATES TAX COURT


PHILIPPE AND NADINE GRELSAMER, Petitioners $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent

DAVID E. MORGAN, Petitioner $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 5788-90, 30317-91.          Filed August 27, 1996.


Stuart A. Smith and David H. Schnabel, for petitioners in docket Nos. 5799-90 and 30317-91.

Gail A. Campbell and Frances Ferrito Regan, for respondent in docket No. 5788-90.

Wendy Sands and Frances Ferrito Regan, for respondent in docket No. 30317-91.

CONTENTS

                                                                    Page
MEMORANDUM FINDINGS OF FACT AND OPINION......................2
OPINION OF THE SPECIAL TRIAL JUDGE...........................3
FINDINGS OF FACT.............................................6
   A. The Plastics Recycling Transactions......................6
   B. The Partnerships.......................................9
   C. Richard Roberts......................................12
   D. Stuart Becker and Steven Leicht.....................13
   E. Petitioners and Their Introduction to the Partnership
      Transactions........................................17
      1. Philippe and Nadine Grelsamer......................17
      2. David E. Morgan...................................20
OPINION.....................................................23
   A. Section 6653(a)--Negligence...........................26
      1. The So-Called Oil Crisis.........................28
      2. Petitioners' Purported Reliance on Tax
         Advisers......................................34
         a. The Circumstances Under Which a Taxpayer May
            Avoid Liability Under Section 6653(a)(1) and
            (2) Because of Reasonable Reliance on
            Competent and Fully Informed Professional
            Advice.....................................35
         b. Green and the Tax Return Preparers.............37
         c. Becker.......................................38
         d. Conclusion as to Petitioners' Alleged
            Reliance on Becker..........................43
      3. The Private Offering Memoranda....................46
      4. Miscellaneous....................................51
      5. Conclusion as to Negligence......................57
   B. Section 6659--Valuation Overstatement.................58
      1. The Grounds for Petitioners' Underpayments........60
      2. Concession of the Deficiency.....................64
      3. Section 6659(e)..................................68
   C. Petitioners' Motions For Leave To File Motion for
      Decision Ordering Relief From the Negligence Penalty
      and the Penalty Rate of Interest and To File Supporting
      Memoranda of Law........................................72

MEMORANDUM FINDINGS OF FACT AND OPINION

DAWSON, <u>Judge</u>:  These cases were assigned to Special Trial

Judge Norman H. Wolfe pursuant to the provisions of section

7443A(b)(4) and Rules 180, 181, and 183.  They were tried and

briefed separately but consolidated for purposes of opinion.  All

section references are to the Internal Revenue Code in effect for the tax years in issue, unless otherwise indicated. All Rule references are to the Tax Court Rules of Practice and Procedure. The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below.

OPINION OF THE SPECIAL TRIAL JUDGE

WOLFE, Special Trial Judge: These cases are part of the Plastics Recycling group of cases. For a detailed discussion of the transactions involved in the Plastics Recycling cases, see Provizer v. Commissioner, T.C. Memo. 1992-177, affd. without published opinion 996 F.2d 1216 (6th Cir. 1993). The underlying transactions in these cases are substantially identical to the transaction considered in the Provizer case.

In a notice of deficiency dated January 11, 1990, respondent determined a deficiency in the 1982 joint Federal income tax of petitioners Philippe and Nadine Grelsamer and additions to tax for that year under section 6653(a)(1)(A) and (B) for negligence and under section 6659 for valuation overstatement (and in the alternative thereto under section 6661 for substantial underpayment). Respondent also determined that interest on deficiencies accruing after December 31, 1984, would be calculated at 120 percent of the statutory rate under section 6621(c). In her answer to petition, respondent asserted a lesser deficiency in the amount of $26,223 as well as reduced additions to tax in the amount of $6,949 under section 6659, in the amount

of $1,158 under section 6653(a)(1), and under section 6653(a)(2)
in an amount equal to 50 percent of the interest due on the
underpayment attributable to negligence. Respondent also
asserted that only $23,163 of the deficiency is subject to the
increased rate of interest under section 6621(c).

In a notice of deficiency dated September 30, 1991,
respondent determined deficiencies in the 1978, 1980, 1981, and
1982 Federal income taxes of petitioner David E. Morgan (Morgan)
in the respective amounts of $23,031, $38,491, $33,928, and
$6,618. The deficiencies for taxable years 1978 and 1980 are due
all or in part to respondent's disallowance of an investment
credit carryback from taxable year 1981. Respondent also
determined the following additions to tax.

| | Additions to Tax | | | |
|------|------------|---------------|---------------|-----------|
| Year | Sec. 6653(a) | Sec. 6653(a)(1) | Sec. 6653(a)(2) | Sec. 6659 |
| 1978 | $1,152 | -- | -- | $6,909 |
| 1980 | 1,925 | -- | -- | 2,643 |
| 1981 | -- | $1,696 | [1] | 4,275 |
| 1982 | -- | 331 | [1] | -- |

[1]50 percent of the interest payable with respect to the portion of the underpayment attributable to negligence.

In her answer to petition, respondent asserted that interest on
deficiencies accruing after December 31, 1984, would be
calculated at 120 percent of the statutory rate under section
6621(c).

The parties in these consolidated cases each filed
Stipulations of Settled Issues relating to their participation in
the Plastics Recycling Program. These stipulations are virtually

identical except that petitioner Morgan's is drafted in the singular because he is the sole petitioner in docket No. 30317-91. The stipulations provide, in part:

1. Petitioners are not entitled to any deductions, losses, investment credits, business energy investment credits or any other tax benefits claimed on their tax returns as a result of their participation in the Plastics Recycling Program.

2. The underpayments in income tax attributable to petitioners' participation in the Plastics Recycling Program are substantial underpayments attributable to tax-motivated transactions, subject to the increased rate of interest established under I.R.C. §6621(c), formerly §6621(d).

3. This stipulation resolves all issues that relate to the items claimed on petitioners' tax returns resulting from their participation in the Plastics Recycling Program, with the exception of petitioners' potential liability for additions to the tax for valuation overstatements under I.R.C. §6659 and for negligence under the applicable provisions of §6653(a).

Petitioner Morgan also stipulated that he did not intend to contest the value of the Sentinel recycler or the existence of a valuation overstatement on his returns, but reserved his right to argue that his underpayments were not attributable to a valuation overstatement and that the section 6659 addition to tax should have been waived by respondent under section 6659(e). In a Second Stipulation of Settled Issues, petitioner Morgan and respondent stipulated that "with respect to the non-plastics recycling issues for the years in issue, the parties agree to the adjustments as set forth in the statutory notice of deficiency."

Long after the trials of these cases, petitioners each filed a Motion For Leave to File Motion for Decision Ordering Relief From the Negligence Penalty and the Penalty Rate of Interest and to File Supporting Memorandum of Law under Rule 50.  These motions were filed with attached exhibits on September 22, 1995, in docket No. 30317-91 (Morgan), and on October 18, 1995, in docket No. 5788-90 (Grelsamer).  On those same dates, petitioners each lodged with the Court a motion for decision ordering relief from the additions to tax for negligence and the increased rate of interest, with attachments, and a memorandum in support of such motion.  Subsequently, respondent filed objections, with attachments, and memoranda in support thereof, and petitioners lodged reply memoranda.  For reasons discussed in more detail at the end of this opinion, and also in Farrell v. Commissioner, T.C. Memo. 1996-295, petitioners' motions shall be denied; see also Zenkel v. Commissioner, T.C. Memo. 1996-398.

The issues remaining in these consolidated cases are:  (1) Whether petitioners are liable for additions to tax for negligence under the provisions of section 6653(a); and (2) whether petitioners are liable for additions to tax under section 6659 for underpayments of tax attributable to valuation overstatement.

FINDINGS OF FACT

Some of the facts have been stipulated in each case and are so found. The stipulated facts and attached exhibits are incorporated in the respective cases by this reference.

A.  The Plastics Recycling Transactions

These cases concern petitioners' investments in two limited partnerships that leased Sentinel expanded polyethylene (EPE) recyclers:  Plymouth Leasing Associates (Plymouth) and SAB Resource Reclamation Associates (SAB Reclamation).  Petitioners Grelsamer are limited partners in SAB Reclamation and petitioner Morgan is a limited partner in Plymouth.  For convenience, we refer to these partnerships collectively as the Partnerships.

The transactions involving the Sentinel EPE Recyclers leased by the Partnerships are substantially identical to those in the Clearwater Group limited partnership (Clearwater), the partnership considered in Provizer v. Commissioner, T.C. Memo. 1992-177.  Petitioners have stipulated substantially the same facts concerning the underlying transactions as we found in the Provizer case.

In the Provizer case, Packaging Industries, Inc. (PI), manufactured and sold six Sentinel EPE recyclers to ECI Corp. for $981,000 each.  ECI Corp., in turn, resold the recyclers to F & G Corp. for $1,162,666 each.  F & G Corp. then leased the recyclers to Clearwater, which licensed the recyclers to FMEC Corp., which

sublicensed them back to PI.  The sales of the recyclers from PI to ECI Corp. were financed with nonrecourse notes.  Approximately 7 percent of the sales price of the recyclers sold by ECI Corp. to F & G Corp. was paid in cash with the remainder financed through notes.  These notes provided that 10 percent of the notes were recourse but that the recourse portion of the notes was only due after the nonrecourse portion, 90 percent, was paid in full.

All of the monthly payments required among the entities in the above transactions offset each other.  These transactions were done simultaneously.  Although the recyclers were sold and leased for the above amounts within the structure of simultaneous transactions, the fair market value of a Sentinel EPE recycler in 1981 and 1982 was not in excess of $50,000.

PI allegedly sublicensed the recyclers to entities that would use them to recycle plastic scrap.  The sublicense agreements provided that the end-users would transfer to PI 100 percent of the recycled scrap in exchange for a payment from FMEC Corp. based on the quality and amount of recycled scrap.

Like Clearwater, each of the Partnerships leased Sentinel EPE recyclers from F & G Corp. and licensed those recyclers to FMEC Corp.  The transactions of the Partnerships differ from the underlying transactions in the Provizer case in the following respects:  (1) The entity that leased the machines from F & G Corp. and licensed them to FMEC Corp., and (2) the number of

machines sold, leased, licensed, and sublicensed.  Plymouth leased and licensed seven Sentinel EPE recyclers.  SAB Reclamation was to lease and license eight recyclers, according to its offering memorandum, but the SAB Reclamation partnership tax return for 1982 indicates that it leased and licensed only four recyclers.

For convenience, we refer to the series of transactions among PI, ECI Corp., F & G Corp., each of the Partnerships, FMEC Corp., and PI as the Partnership transactions.  In addition to the Partnership transactions, a number of other limited partnerships entered into transactions similar to the Partnership transactions, also involving Sentinel EPE recyclers and Sentinel expanded polystyrene (EPS) recyclers.  We refer to these collectively as the Plastics Recycling transactions.

B.  The Partnerships

Plymouth and SAB Reclamation are New York limited partnerships that were formed in late 1981 and early 1982, respectively.  The general partner of Plymouth is Richard Roberts (Roberts).

SAB Reclamation was organized and promoted by Stuart Becker (Becker), a certified public accountant (C.P.A.) and the founder and principal owner of Stuart Becker & Co., P.C. (Becker Co.), an accounting firm that specialized in tax matters.  Becker organized a total of six recycling partnerships (the SAB

Recycling Partnerships).  Two of the SAB Recycling Partnerships closed in late 1981, two closed in early 1982, and two more closed in late 1982.

The general partner of all of the SAB Recycling Partnerships, including SAB Reclamation, is SAB Management Ltd. (SAB Management).  SAB Management is wholly owned by Scanbo Management Ltd. (Scanbo), which is wholly owned by Becker. Scanbo is an acronym for three of Becker's children:  Scott, Andy, and Bonnie.  The officers and directors of SAB Management and Scanbo are as follows:  (1) Becker, president and director; (2) Noel Tucker (Tucker), vice president, treasurer, and director; and (3) Steven Leicht (Leicht), vice president, secretary, and director.  During the years in issue, Tucker and Leicht also worked at Becker Co.  Tucker was vice president. Each owned approximately 5 to 7 percent of the stock of Becker Co.  SAB Management did not engage in any business before becoming involved with the SAB Recycling Partnerships.

With respect to each of the Partnerships, a private placement memorandum was distributed to potential limited partners.  Reports by F & G Corp.'s evaluators, Dr. Stanley M. Ulanoff (Ulanoff), a marketing consultant, and Dr. Samuel Z. Burstein (Burstein), a mathematics professor, were appended to the offering memoranda.  Ulanoff owns a 1.27-percent interest in Plymouth and a 4.37-percent interest in Taylor Recycling

Associates, partnerships that leased Sentinel recyclers. Burstein owns a 2.605-percent interest in Empire Associates and a 5.82-percent interest in Jefferson Recycling Associates, also partnerships that leased Sentinel recyclers. Burstein also was a client and business associate of Elliot I. Miller (Miller), the corporate counsel to PI.

The offering memoranda for Plymouth and SAB Reclamation state that the general partner will receive fees from those partnerships in the respective amounts of $37,500 and $110,000. SAB Management received fees of approximately $500,000 as the general partner of the SAB Recycling Partnerships. In addition, Becker Co. prepared the partnership returns and Forms K-1 for all of the SAB Recycling Partnerships and received fees for those services.

The offering memoranda for Plymouth and SAB Reclamation state that sales commissions and offeree representative fees will be paid in amounts equal to 10 percent and 7.5 percent, respectively, of each investment guided to the partnerships and that the general partner "may retain as additional compensation all amounts not paid as sales commissions or offeree representative fees." However, neither SAB Management nor Becker retained or received any sales commissions or offeree representative fees. Instead, after the closing of each SAB Recycling Partnership, Becker rebated to each investor whose

investment was not subject to a sales commission or offeree representative fee an amount equal to 7.5 percent of such investor's original investment.

The offering memoranda list significant business and tax risk factors associated with investments in the Partnerships. Specifically, the offering memoranda state: (1) There is a substantial likelihood of audit by the Internal Revenue Service (IRS) and the purchase price paid by F & G Corp. to ECI Corp. probably will be challenged as being in excess of fair market value; (2) the Partnerships have no prior operating history; (3) the general partner has no prior experience in marketing recycling or similar equipment; (4) the limited partners have no control over the conduct of the Partnerships' business; (5) there is no established market for the Sentinel EPE recyclers; (6) there are no assurances that market prices for virgin resin will remain at their current costs per pound or that the recycled pellets will be as marketable as virgin pellets; and (7) certain potential conflicts of interest exist.

C.  Richard Roberts

Roberts is a businessman and the general partner in a number of limited partnerships that leased and licensed Sentinel EPE recyclers, including Plymouth.  He also is a 9-percent shareholder in F & G Corp., the corporation that leased the recyclers to Plymouth and SAB Reclamation.  From 1982 through

1985, Roberts maintained the following office address with

Raymond Grant (Grant), the sole owner and president of ECI Corp.:

                    Grant/Roberts
                    Investment Banking
                    Tax Sheltered Investments
                    745 Fifth Avenue, Suite 410
                    New York, New York  10022

Grant was instrumental in the hiring of Ulanoff as an evaluator

of the Plastics Recycling transactions; the two had met on a

cruise.  Roberts and Grant together have been general partners in

other investments.

Prior to the Partnership transactions, Roberts and Grant

were clients of the accounting firm H. W. Freedman & Co.

(Freedman & Co.).  Harris W. Freedman (Freedman), the named

partner in Freedman & Co., was the president and chairman of the

board of F & G Corp.  He also owned 94 percent of a Sentinel EPE

recycler.  Freedman & Co. prepared the partnership returns for

ECI Corp., F & G Corp., and Plymouth.  It also provided tax

services to John D. Bambara (Bambara).  Bambara is the

100-percent owner of FMEC Corp., as well as its president,

treasurer, clerk, and director.  He, his wife, and daughter also

owned directly or indirectly 100 percent of the stock of PI.

D.  Stuart Becker and Steven Leicht

Becker does not have an engineering background, and he is

not an expert in plastics materials or plastics recycling.  He

received a B.S. degree in accounting from New York University in

1964 and an M.B.A. in taxation from New York University School of Business Administration in 1973. He passed the certified public accountancy test in 1967 and was the winner of the gold medal, awarded for achieving the highest score on the examination for that year. Since early 1966, Becker has practiced as a C.P.A. exclusively in the tax area. From 1964 until 1972 he worked for the accounting firm of Touche, Ross & Co., and in 1972 he joined the accounting firm of Richard A. Eisner & Co. as the partner in charge of the tax department. In 1977, Becker founded Becker Co.

Becker had considerable experience involving tax shelter transactions before he organized the SAB Recycling Partnerships. He prepared opinions regarding tax shelters' economic and tax projections, advised individuals and companies with respect to investments in tax shelters, lectured extensively about tax shelter investments generally, and lectured and published with respect to leveraged tax shelters. Becker described a leveraged tax shelter as "a transaction where [the ratio of] the effective [tax] writeoff, which includes the value of the tax credit, * * * [to the amount invested] exceeds one to one." Becker Co. specialized in tax-advantaged investments. From 1980 to 1982, approximately 60 percent of the work done by Becker Co. involved tax sheltered and private investments. Becker has owned minority interests in general partners of numerous limited partnerships. Prior to organizing the SAB Recycling Partnerships, Becker owned

5 percent of the general partner of partnerships involved in approximately 14 transactions with respect to river transportation (such as barges, tow boats, and grain elevators).

Although investment counseling was related to his firm's line of business, Becker did not consider himself in the business of providing investment advice. Becker did not normally hire other professionals for consultation or advice. In circumstances where he believed there was a need for outside advice, he would so advise the client. Between 30 and 40 of Becker's clients invested in the Plastics Recycling partnerships.

Becker learned of the Plastics Recycling transactions when a prospective client presented him with an offering memorandum concerning the transactions in August or September 1981. Becker reviewed the offering memorandum and spoke to Miller, one of the key figures in the transactions and an acquaintance of Becker's. Miller was a shareholder of F & G Corp. and, as noted, the corporate counsel to PI. He also represented Grant and some of Grant's clients. Thereafter, Becker recommended the investment to the prospective client. Although the prospective client did not invest in the Plastics Recycling transactions, Becker became interested in the proposal and organized the SAB Recycling Partnerships in order to make similar investments in Sentinel EPE recyclers conveniently available to appropriate clients.

In organizing the SAB Recycling Partnerships, Becker was not allowed to change the format of the transactions or the purchase, lease, or licensing prices of the Sentinel EPE recyclers. He was allowed only to conduct a limited investigation of the proposed investments and choose whether or not to organize similar partnerships. Becker relied heavily upon the offering materials and discussions with persons involved in the matter to evaluate the Plastics Recycling transactions. He and two other members of Becker Co., Leicht and Tucker, investigated PI and visited its plant in Hyannis, Massachusetts, where they saw the Sentinel EPE recyclers. Tucker did not testify at either of petitioners' trials.

During his investigation of the Plastics Recycling transactions, Becker did not hire any plastics, engineering, or technical experts, or recommend that his clients do so. Becker discussed the transactions with Michael Canno (Canno) of the Equitable Bag Co., a manufacturer of paper and plastic bags. Canno never saw the recyclers or the pellets and never wrote any reports assessing the equipment or the pellets. Becker retained a law firm, Rabin & Silverman, to assist him in organizing the SAB Recycling Partnerships. See, e.g., Spears v. Commissioner, T.C. Memo. 1996-341, to the effect that in employing the law firm, Becker particularly sought to protect himself against liability.

After the 1981 SAB Recycling Partnerships closed, Becker had an accountant sent to PI to confirm, by serial number, that as of December 31, 1981, the equipment that was leased to the 1981 SAB Recycling Partnerships was indeed available for use.  Becker arranged for this verification, independent of PI, because he understood that the investment tax and business energy credits would not be available if the qualifying property was not available for use.

Leicht and Tucker also familiarized themselves with the Plastics Recycling transactions.  Leicht has a B.A. degree in finance and accounting from Penn State University, a J.D. from SUNY Buffalo, and an LL.M. in taxation from New York University School of Law.  Leicht ran a mathematical check on the numbers contained in the offering materials for Becker, but he did not test the underlying assumptions upon which they were based.  He also visited PI in Hyannis and met with Miller and other insiders to the transactions.  Leicht never communicated an opinion as to the value of the recyclers other than what was presented in the offering memoranda.  He has no education or expertise in plastics materials or plastics recycling.

E.  Petitioners and Their Introduction to the Partnership Transactions

1.  Philippe and Nadine Grelsamer

Petitioners Philippe and Nadine Grelsamer (the Grelsamers) resided in New York, New York, at the time their petition was

filed. Nadine Grelsamer is a petitioner in docket No. 5788-90 solely because she filed a joint Federal income tax return with her husband Philippe for the year in issue.

Philippe Grelsamer (Grelsamer) graduated high school in France and thereafter received a B.S. degree in industrial engineering from the Rensselair Polytechnic Institute (RPI) in New York State in 1945. He then worked for 2 years in the engineering department of the Carrier Corp. (Carrier), which he considered to be the leading air conditioning and refrigeration corporation in the United States, if not the world. After leaving Carrier, Grelsamer worked in the marketing department of a cosmetics firm for several years and after that as an agent for a biochemical manufacturer that specialized in products for the cosmetics industry. Sometime in the late 1950's or early 1960's, Grelsamer became self-employed as a money manager. At that time, he already had started managing money for family members and friends. Grelsamer invested his clients' money in the stock market and liquid securities in general. Over the years, Grelsamer has reviewed hundreds of preliminary prospectuses and he has personally invested in dozens of private placements.

After the oil embargo in the early 1970's, Grelsamer sought to invest in oil drilling ventures. He expressed his interest to a social acquaintance who had experience in the oil business, petitioner Morgan. Morgan was interested, and the two contacted

a mutual friend and attorney, Paul Green (Green), to help structure an appropriate investment vehicle. Grelsamer had known Green on a social basis since the late 1940's or early 1950's, but had never before conducted business with him or employed his services. Grelsamer, Morgan, and Green took the necessary steps to ensure a minimum return on each oil drilling investment, even if the price of oil went down.

Grelsamer learned of the Plastics Recycling transactions from Green sometime in late 1981 or early 1982. Green introduced him to Becker, who Grelsamer understood was an accountant and not in the plastics business. Grelsamer's accountant at the time confirmed that Becker had a good reputation as an accountant. Becker gave Grelsamer a copy of the offering memorandum, which he spent at least a few hours reading during several sittings. Grelsamer thought the numbers "looked terribly good, maybe too good." He presented his general, overall questions to Green and his more specific questions to Becker.

Becker told Grelsamer about his visit to PI. Grelsamer believed that Becker went to Hyannis to see that the recycler existed and to get an impression of PI. He was under no illusions as to the limits of Becker's ability to assess the recyclers. According to Grelsamer, Becker "certainly was not an engineer and * * * [his visit to PI] could not have meant too

much to him and I'm sure it didn't. They can't talk to him." Grelsamer purportedly concluded that the Sentinel EPE recycler was unique on the basis of his discussions with Becker and the assessments by Ulanoff and Burstein, whose credentials he believed that Becker had checked.

Grelsamer has no education in plastics recycling or plastics materials. He knew that Becker was the de facto general partner of SAB Reclamation and that Becker had no experience in plastics recycling. Grelsamer did not know whether Green had any experience in the plastics recycling business. Grelsamer did not investigate the value of the Sentinel EPE recycler or how it functioned or compare it with other similar products. He did not visit any of the end-user locations or review any periodicals relating to resin prices. Grelsamer did not talk to Green about the tax benefits associated with SAB Reclamation. Instead he discussed them with his tax return preparer, Abraham Israelite. Six months after investing in SAB Reclamation, Grelsamer invested in a second plastics recycling partnership. Grelsamer never made a profit in any year from his interest in SAB Reclamation.

### 2. David E. Morgan

Morgan resided in Palm Beach, Florida, at the time his petition was filed. He was born and raised in Poland. When he was 8 or 9 years old, oil was discovered on his family's farm,

and they went into the oil business, which spurred Morgan's interest in engineering and geology.  Morgan attended the University of Leige, Belgium, and in 1938 he transferred to the Massachusetts Institute of Technology (MIT), where he graduated in 1939 with a B.S. degree in petroleum engineering.  From there he went to Columbia University to earn a graduate degree in geology.  Upon receiving his degree in 1940, Morgan worked for about a year at the General Geophysical Co. prospecting for oil and then for 2 to 3 years for Continental Oil in Indiana. Thereafter he was hired by Dresser Industries and was put in charge of machining for the production of warheads for half-ton bombs.

When the war ended, Morgan opened and operated his own business, Peerless Precision Products Co. (Peerless), in Pawtucket, Rhode Island.  Peerless specialized in making components, assemblies, and subassemblies for engine manufacturers, such as United Technology and Lockheed, primarily in the aircraft industry.  Morgan also organized and syndicated joint ventures involved in drilling for oil in Texas, Oklahoma, and New York State.  Before proceeding with any oil drilling venture, Morgan would hire a geologist in the area to assess the potential for oil extraction.  Morgan's oil drilling ventures were about 30 to 40 percent successful in his first few years in

the business.  Consequently, Morgan turned to more conservative oil drilling ventures, so-called development drilling, which yielded a success ratio of 90 to 95 percent.  Development drilling involves acquiring land, if available, and drilling between two producing wells.  Morgan raised money for his oil drilling ventures from relatives and friends.  One such friend was Green, whom Morgan had met sometime in the mid-1970's.

Morgan learned of the Plastics Recycling transactions, specifically Plymouth, from either Roberts or some other casual acquaintance.  He discussed it with Green for no more than 5 to 10 minutes, and Green suggested that he speak with Becker.  Shortly thereafter he spoke to Becker for no more than 30 minutes about the Plastics Recycling transactions.  Becker informed him of his efforts relating to the investment and provided him with all the information he provided to other investors.  Morgan spent about half a day reviewing the offering memorandum and then sent it to his accountant in Boston, Martin Braver (Braver).  After talking to Green and Becker, Morgan asked at a social gathering whether anyone knew Burstein, and he received an affirmative response from one of his social acquaintances.  Morgan accepted that the Sentinel EPE recycler was a technically viable piece of equipment and decided to invest in it.

Becker and Green never represented to Morgan that they were specialists in plastics and Morgan did not believe that they were. Morgan has no work experience in plastics recycling. At the time he made his investment, Morgan lived in or near Pawtucket, which is just a short distance from Hyannis, the location of PI. Morgan has been to Hyannis many times, but he did not visit PI or see a Sentinel EPE recycler prior to making his investment. He never asked whether there were any other machines that could recycle low density polyethylene or polystyrene. Morgan did not make any independent investigation of the value placed on the recyclers. He was not aware of any companies that would be suitable end-users for the recyclers. Morgan never made a profit in any year from his investment in Plymouth.

## OPINION

We have decided a large number of the Plastics Recycling group of cases.[1] The majority of these cases, like the

---

[1] Provizer v. Commissioner, T.C. Memo. 1992-177, affd. without published opinion 996 F.2d 1216 (6th Cir. 1993), concerned the substance of the partnership transaction and also the additions to tax.

The following cases concerned the addition to tax for negligence, inter alia: Zenkel v. Commissioner, T.C. Memo. 1996-398; Estate of Busch v. Commissioner, T.C. Memo. 1996-342; Spears v. Commissioner, T.C. Memo. 1996-341; Stone v. Commissioner, T.C. Memo. 1996-230; Reimann v. Commissioner, T.C. Memo. 1996-84; Bennett v. Commissioner, T.C. Memo. 1996-14; Atkind v.

(continued...)

consolidated cases herein, raised issues regarding additions to tax for negligence and valuation overstatement.  We have found the taxpayers liable for such additions to tax in all but one of the opinions to date on these issues, although procedural rulings have involved many more favorable results for taxpayers.[2]

---

[1](...continued)
Commissioner, T.C. Memo. 1995-582; Triemstra v. Commissioner, T.C. Memo. 1995-581; Pace v. Commissioner, T.C. Memo. 1995-580; Dworkin v. Commissioner, T.C. Memo. 1995-533; Wilson v Commissioner, T.C. Memo. 1995-525; Avellini v. Commissioner, T.C. Memo. 1995-489; Paulson v. Commissioner, T.C. Memo. 1995-387; Zidanich v. Commissioner, T.C. Memo. 1995-382; Ramesh v. Commissioner, T.C. Memo. 1995-346; Reister v. Commissioner, T.C. Memo. 1995-305; Fralich v. Commissioner, T.C. Memo. 1995-257; Shapiro v. Commissioner, T.C. Memo. 1995-224; Pierce v. Commissioner, T.C. Memo. 1995-223; Fine v. Commissioner, T.C. Memo. 1995-222; Pearlman v. Commissioner, T.C. Memo. 1995-182; Kott v. Commissioner, T.C. Memo. 1995-181; Eisenberg v. Commissioner, T.C. Memo. 1995-180.
     Greene v. Commissioner, 88 T.C. 376 (1987), concerned the applicability of the safe-harbor leasing provisions of sec. 168(f)(8).  Trost v. Commissioner, 95 T.C. 560 (1990), concerned a jurisdictional issue.
     Farrell v. Commissioner, T.C. Memo. 1996-295; Baratelli v. Commissioner, T.C. Memo. 1994-484; Estate of Satin v. Commissioner, T.C. Memo. 1994-435; Fisher v. Commissioner, T.C. Memo. 1994-434; Foam Recycling Associates v. Commissioner, T.C. Memo. 1992-645; Madison Recycling Associates v. Commissioner, T.C. Memo. 1992-605, concerned other issues.

[2]     In Zidanich v. Commissioner, T.C. Memo. 1995-382, we held the taxpayers liable for the sec. 6659 addition to tax, but not liable for the negligence additions to tax under sec. 6653(a).  As indicated in our opinion, the Zidanich case, and the Steinberg case consolidated with it for opinion, involved exceptional circumstances.
     In Estate of Satin v. Commissioner, supra, and Fisher v. Commissioner, supra, after the decision in Provizer v. Commissioner, supra, the taxpayers were allowed to elect to
                                             (continued...)

In Provizer v. Commissioner, T.C. Memo. 1992-177, a test case for the Plastics Recycling group of cases, this Court (1) found that each Sentinel EPE recycler had a fair market value not in excess of $50,000, (2) held that the transaction, which is almost identical to the Partnership transactions in these consolidated cases, was a sham because it lacked economic substance and a business purpose, (3) upheld the section 6659 addition to tax for valuation overstatement since the underpayment of taxes was directly related to the overstatement of the value of the Sentinel EPE recyclers, and (4) held that losses and credits claimed with respect to Clearwater were attributable to tax-motivated transactions within the meaning of section 6621(c). In reaching the conclusion that the transaction lacked economic substance and a business purpose, this Court relied heavily upon the overvaluation of the Sentinel EPE recyclers.

Although petitioners have not agreed to be bound by the Provizer opinion, they have stipulated that the investments in

---

2(...continued)
accept a beneficial settlement because of exceptional circumstances. In Farrell v. Commissioner, supra, we rejected taxpayers' claim to a similar belated settlement arrangement since the circumstances were different and taxpayers previously had rejected settlement and elected to litigate the case. See also Baratelli v. Commissioner, supra; Zenkel v. Commissioner, T.C. Memo. 1996-398.

the Sentinel EPE recyclers in these cases are similar to the investment described in Provizer v. Commissioner, supra. The underlying transactions in these consolidated cases, and the Sentinel EPE recyclers considered in these cases, are the same type of transaction and same type of machines considered in Provizer v. Commissioner, supra.

Based on the entire records in these cases, including the extensive stipulations, testimony of respondent's experts, and petitioners' testimony, we hold that each of the Partnership transactions herein was a sham and lacked economic substance. In reaching this conclusion, we rely heavily upon the overvaluation of the Sentinel EPE recyclers. Respondent is sustained on the question of the underlying deficiencies. We note that petitioners have explicitly conceded this issue in the respective stipulations of settled issues filed shortly before trial. The record plainly supports respondent's determination regardless of such concessions. For a detailed discussion of the facts and the applicable law in a substantially identical case, see Provizer v. Commissioner, supra.

A.  Section 6653(a)--Negligence

Respondent determined that petitioners are liable for additions to tax for negligence under the provisions of section 6653(a). Petitioners have the burden of proving that

respondent's determinations of these additions to tax are erroneous. Rule 142(a); Luman v. Commissioner, 79 T.C. 846, 860-861 (1982).

Section 6653(a) for 1978 and 1980, and section 6653(a)(1) for 1981 and 1982, impose an addition to tax equal to 5 percent of the underpayment if any part of an underpayment of tax is due to negligence or intentional disregard of rules or regulations. Section 6653(a)(2) imposes an addition to tax equal to 50 percent of the interest payable with respect to the portion of the underpayment attributable to negligence or intentional disregard of rules or regulations.

Negligence is defined as the failure to exercise the due care that a reasonable and ordinarily prudent person would employ under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). The question is whether a particular taxpayer's actions in connection with the transactions were reasonable in light of his experience and the nature of the investment or business. See Henry Schwartz Corp. v. Commissioner, 60 T.C. 728, 740 (1973). When considering the negligence addition to tax, we evaluate the particular facts of each case, judging the relative sophistication of the taxpayers, as well as the manner in which they approached their investment. McPike v. Commissioner, T.C. Memo. 1996-46. Compare, e.g., Spears v. Commissioner, T.C. Memo. 1996-341, with Zidanich v. Commissioner, T.C. Memo. 1995-382.

When petitioners invested in the partnerships, they had no education or experience in plastics materials or plastics recycling, nor had any of them seen a Sentinel recycler.  In each of these consolidated cases, petitioners contend that they were reasonable in claiming deductions and credits with respect to the Partnerships.  In support of such contentions, petitioners argue, in general terms:  (1) That claiming the deductions and credits with respect to the Partnerships was reasonable in light of the so-called oil crisis in the United States in 1981 and 1982; and (2) that they reasonably relied upon the offering materials and qualified advisers, specifically Becker, Green, and their tax return preparers.

### 1.  The So-Called Oil Crisis

Petitioners maintain that they reasonably expected to make an economic profit from the Partnership transactions, in particular because plastic is an oil derivative and the United States was experiencing a so-called oil crisis during the years 1981 and 1982.  In support of this argument, petitioners cite Krause v. Commissioner, 99 T.C. 132 (1992), affd. sub nom. Hildebrand v. Commissioner, 28 F.3d 1024 (10th Cir. 1994).

Petitioners' contention that they reasonably expected an economic profit from the Partnership transactions is unconvincing, regardless of the so-called oil crisis. Petitioners made no effort to resolve the caveats and warnings

contained in the offering memoranda.  See The Private Offering Memoranda, <u>infra</u> at 43.  Nor did they seriously investigate or educate themselves in the Plastics Recycling transactions. Testimony by one of respondent's experts establishes that the oil pricing changes during the late 1970's and early 1980's did not justify petitioners' claiming excessive investment credits and purported losses based on vastly exaggerated valuations of recycling machinery.  Moreover, petitioners' alleged blind faith that oil prices would continue to rise is inconsistent with the conservative manner in which they approached their oil drilling ventures.  According to Grelsamer, he and Morgan chose and organized their oil drilling ventures to ensure at least a minimum return, "whether [the price of] oil went up or down".

Petitioners each earned an engineering degree, Grelsamer from RPI and Morgan from MIT.  Grelsamer worked in the engineering department of the "leading air conditioning and refrigeration corporation in the United States, if not the world." He has reviewed hundreds of preliminary prospectuses over the course of his career as a money manager.  Morgan was employed in the production of warheads for half-ton bombs at Dresser Industries.  Specifically, he was in charge of machining, and later he founded a company that made components, assemblies, and subassemblies for engine manufacturers.  In organizing and syndicating their oil drilling ventures, petitioners took the

necessary steps and made the necessary effort to ensure at least a minimum return. Morgan consulted a local geologist or expert with respect to each potential well. Petitioners only invested in so-called development drilling, which yielded a success rate of 90 to 95 percent.

That effort and prudence are not evident with respect to petitioners' investments in the Partnerships. Morgan lived a relatively short distance from PI's headquarters and manufacturing facility in Hyannis at the time, but neither he nor Grelsamer ever physically inspected or even saw a Sentinel EPE recycler. Petitioners did not personally investigate the value placed on the recycler or hire a plastics or recycling expert to assess the machine. Morgan was unaware of any companies that would be suitable end-users for the recyclers and neither petitioner ever visited any end-user locations. Grelsamer claims that he thought that the Sentinel EPE recyclers were unique based upon the reports by Ulanoff and Burstein, who he allegedly believed were qualified, disinterested evaluators. However, Ulanoff and Burstein each own interests in partnerships that lease Sentinel recyclers, and the offering memoranda disclosed that Burstein was a client and business associate of the corporate counsel to PI, Miller. In light of their inadequate investigation of the Partnership transactions, especially when compared to the care and effort they put into their oil drilling

ventures, we find that petitioners' claims that they reasonably expected an economic profit from the Partnership transactions are incredible, even taking into consideration the so-called oil crisis.

Moreover, petitioners did not explain how the so-called oil crisis provided a reasonable basis for them to invest in the Partnerships and claim the associated tax deductions and credits. The offering materials warned that there could be no assurances that prices for new resin pellets would remain at their then current level. One of respondent's experts, Steven Grossman, explained that the price of plastics materials is not directly proportional to the price of oil. In his report, he stated that less than 10 percent of crude oil is utilized for making plastics materials and that studies have shown that "a 300% increase in crude oil prices results in only a 30 to 40% increase in the cost of plastics products." Furthermore, during 1980 and 1981, in addition to the media coverage of the so-called oil crisis, there was "extensive continuing press coverage of questionable tax shelter plans." Zmuda v. Commissioner, 731 F.2d 1417, 1422 (9th Cir. 1984), affg. 79 T.C. 714 (1982).

Petitioners' reliance on Krause v. Commissioner, supra, and Rousseau v. United States, 71A AFTR 2d 93-4294, 91-1 USTC par. 50,252 (E.D. La. 1991), is misplaced. The facts in Krause v. Commissioner, supra, are distinctly different from the facts of

these cases.   In the Krause case, the taxpayers invested in limited partnerships whose investment objectives concerned enhanced oil recovery (EOR) technology.   The Krause opinion states that during the late 1970's and early 1980's, the Federal Government adopted specific programs to aid research and development of EOR technology.   In holding that the taxpayers in the Krause case were not liable for the negligence additions to tax, this Court noted that one of the Government's expert witnesses acknowledged that "investors may have been significantly and reasonably influenced by the energy price hysteria that existed in the late 1970's and early 1980's to invest in EOR technology."   Id. at 177.   In the present cases, however, as explained by respondent's expert Steven Grossman, the price of plastics materials was not directly proportional to the price of oil, and there is no persuasive evidence that the so-called oil crisis had a substantial bearing on petitioners' decision to invest.   While EOR was, according to our Krause opinion, in the forefront of national policy and the media during the late 1970's and 1980's, there is no showing in these records that the so-called energy crisis would provide a reasonable basis for petitioners' investing in recycling of polyethylene, particularly in the machinery here in question.

In addition, the taxpayers in the Krause opinion investigated EOR technology specifically.   One of the taxpayers

in the Krause case undertook significant investigation of the proposed investment including researching EOR technology. The other taxpayer, a geological and mining engineer whose work included research of oil recovery methods, hired an independent geologic engineer to review the offering materials. Id. at 166. Like the latter taxpayer, petitioners are engineers experienced in the oil industry. Unlike the taxpayers in the Krause case, however, petitioners did not research the plastics recycling industry, independently investigate the Sentinel recyclers, or hire an expert in plastics to evaluate the Partnership transactions.

In Rousseau v. United States, supra, the property underlying the investment, ethanol producing equipment, was widely considered at that time to be a viable fuel alternative to oil, and its potential for profit was apparent. In addition, the taxpayer therein conducted an independent investigation of the investment and researched the market for the sale of ethanol in the United States. In contrast, as we noted in distinguishing the Krause case, there is no showing in these records that the so-called oil crisis would provide a reasonable basis for petitioners' investing in the polyethylene recyclers here in question. As noted above, petitioners did not independently investigate the Sentinel EPE recyclers or hire an expert in plastics to evaluate the Partnership transactions. The facts of

petitioners' cases are distinctly different from the Rousseau case.

Because of the circumstances summarized above, we do not consider petitioners' arguments with respect to the Krause and Rousseau cases applicable to the present cases.

2.  Petitioners' Purported Reliance on Tax Advisers

Petitioners maintain that they reasonably relied upon the advice of qualified advisers.  Grelsamer and Morgan discussed the investment with, and purportedly relied upon, Green and Becker. In addition, petitioners' tax return preparers apparently reviewed the offering materials and/or purportedly discussed the investments with petitioners.

The concept of negligence and the argument of reliance on an expert are highly fact intensive.  Petitioners in these cases are engineers experienced in organizing and syndicating investments in the oil industry.  One also is experienced in machine manufacture and the other has for many years been engaged in business as a professional money manager.  These technologically and financially astute businessmen ultimately relied upon an accountant to investigate the tax law and the underlying business circumstances of a proposed investment, the success of which depended upon a purportedly technologically unique machine. Becker, who is experienced in tax matters, explains that he made an investigation within the limits of his resources and abilities

and fully disclosed what he had done.  The question here is whether petitioners, themselves technologically proficient and financially successful, actually and reasonably relied on the accountant with respect to valuation problems requiring expertise in engineering and plastics technology, or whether the accountant gave the tax advice and facilitated the transaction, but did not make a full and independent investigation of the relevant business and technology, and did clearly inform his clients of the limits of his knowledge and investigation of the transaction. For reasons set forth below, we believe the latter statement more accurately describes what happened here.

### a.  The Circumstances Under Which a Taxpayer May Avoid Liability Under Section 6653(a)(1) and (2) Because of Reasonable Reliance on Competent and Fully Informed Professional Advice

A taxpayer may avoid liability for the additions to tax under the provisions of section 6653(a) if he or she reasonably relied on competent professional advice.  United States v. Boyle, 469 U.S. 241, 250-251 (1985); Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991).  Reliance on professional advice, standing alone, is not an absolute defense to negligence, but rather a factor to be considered.  For reliance on professional advice to excuse a taxpayer from the negligence additions to tax, the taxpayer must show that such professional had the expertise and knowledge of the pertinent facts to provide informed advice on the subject matter.

David v. Commissioner, 43 F.3d 788, 789-790 (2d Cir. 1995), affg. T.C. Memo. 1993-621; Goldman v. Commissioner, 39 F.3d 402 (2d Cir. 1994), affg. T.C. Memo. 1993-480; Freytag v. Commissioner, supra; Sacks v. Commissioner, T.C. Memo. 1994-217, affd. 82 F.3d 918 (9th Cir. 1996); Kozlowski v. Commissioner, T.C. Memo. 1993-430, affd. without published opinion 70 F.3d 1279 (9th Cir. 1995); see also Stone v. Commissioner, T.C. Memo. 1996-230; Reimann v. Commissioner, T.C. Memo. 1996-84.

Reliance on representations by insiders, promoters, or offering materials has been held an inadequate defense to negligence. Goldman v. Commissioner, supra; Pasternak v. Commissioner, 990 F.2d 893 (6th Cir. 1993), affg. Donahue v. Commissioner, T.C. Memo. 1991-181; LaVerne v. Commissioner, 94 T.C. 637, 652-653 (1990), affd. without published opinion 956 F.2d 274 (9th Cir. 1992), affd. without published opinion sub nom. Cowles v. Commissioner, 949 F.2d 401 (10th Cir. 1991); Marine v. Commissioner, 92 T.C. 958, 992-993 (1989), affd. without published opinion 921 F.2d 280 (9th Cir. 1991); McCrary v. Commissioner, 92 T.C. 827, 850 (1989); Rybak v. Commissioner, 91 T.C. 524, 565 (1988). Pleas of reliance have been rejected when neither the taxpayer nor the advisers purportedly relied upon by the taxpayer knew anything about the nontax business aspects of the contemplated venture. David v. Commissioner, supra; Goldman v. Commissioner, supra; Freytag v. Commissioner,

supra; Beck v. Commissioner, 85 T.C. 557 (1985); Lax v. Commissioner, T.C. Memo. 1994-329, affd. without published opinion 72 F.3d 123 (3d Cir. 1995); Sacks v. Commissioner, supra; Steerman v. Commissioner, T.C. Memo. 1993-447; Rogers v. Commissioner, T.C. Memo. 1990-619; see also the Plastics Recycling cases cited, supra note 1.

### b.  Green and the Tax Return Preparers

In addition to relying ultimately on Becker, Grelsamer and Morgan assert that they reasonably relied on Green and their respective tax return preparers, Israelite and Braver.  Neither Braver, Green, nor Israelite (who died prior to the Grelsamers' trial) testified at the trials in these cases.  See Bresler v. Commissioner, 65 T.C. 182, 188 (1975), Pollack v. Commissioner, 47 T.C. 92, 108 (1966), affd. 392 F.2d 409 (5th Cir. 1968), and Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947) to the effect that the failure of a party to offer available testimony gives rise to the inference that it would have been unfavorable to his contention.

Grelsamer and Morgan had no reason to believe that Green had any experience or expertise in plastics materials or plastics recycling.  Green, an attorney, apparently answered Grelsamer's general questions about the Plastics Recycling transactions, but by the time of trial Grelsamer could not remember exactly what

they discussed.  Grelsamer claimed that he remembered only that they did not discuss SAB Reclamation's tax benefits.  Morgan discussed Plymouth with Green for no more than 5 or 10 minutes.  Grelsamer testified that he discussed the tax benefits with Israelite, his tax return preparer, but he could not remember for how long, and Morgan testified only that he sent the offering memorandum to Braver, his accountant in Boston.  Nothing in the records of these cases indicates what, if anything, Green, Israelite, or Braver did to investigate the Plastics Recycling transactions, or whether they were qualified to do so, nor is there any record of the substance of their advice.  See Bresler v. Commissioner, supra, Pollack v. Commissioner, supra, and Wichita Terminal Elevator Co. v. Commissioner, supra.  Petitioners have failed to show that they reasonably relied upon Green and their tax return preparers.

    c.  Becker

    Becker had no education, special qualifications, or professional skills in plastics engineering, plastics recycling, or plastics materials.  In evaluating the Plastics Recycling transactions and organizing the SAB Recycling Partnerships, Becker supposedly relied upon:  (1) The offering materials; (2) a tour of the PI facility in Hyannis; (3) discussions with insiders to the transactions; (4) Canno; and (5) his investigation of the

reputation and background of PI and persons involved in the transactions.

Despite his lack of knowledge regarding the product, the target market, and the technical aspects at the heart of the Plastics Recycling transactions, Becker did not hire an expert in plastics materials or plastics recycling, or recommend that his clients do so. The only independent person having any connection with the plastics industry with whom Becker spoke was Canno. A client of Becker Co., Canno was a part owner and the production manager of Equitable Bag Co., a manufacturer of paper and plastic bags. Becker spoke to Canno about the recyclers and PI, but did not hire him or pay him for any advice. Canno did not visit PI's plant in Hyannis, see or test a Sentinel EPE recycler, or see or test any of the output from a Sentinel EPE recycler or the recycled resin pellets after they were further processed by PI. According to Becker, Canno endorsed the Partnership transactions after reviewing the offering materials. Asked at trial if Canno had done any type of comparables analysis, Becker replied, "I don't know what Mr. Canno did."

Becker visited the PI plant in Hyannis, toured the facility, viewed a Sentinel EPE recycler in operation, and saw products that were produced from recycled plastic. Grelsamer testified that because Becker was not an engineer, he was sure that Becker's visit "could not have meant too much to him" and he

doubted that the people at PI could even "talk to [Becker]."
Becker claims that during his visit, he was told that the
recycler was unique and that it was the only machine of its type.
In fact, the Sentinel EPE recycler was not unique. Several
machines capable of densifying low density materials already were
on the market. Other plastics recycling machines available
during 1981 ranged in price from $20,000 to $200,000, including
the Foremost Densilator, Nelmor/Weiss Densification System
(Regenolux), Buss-Condux Plastcompactor, and Cumberland
Granulator. See Provizer v. Commissioner, T.C. Memo. 1992-177.

Becker was also told that PI had put an enormous amount of
research and development--10 to 12 years' worth--into the
creation and production of the Sentinel EPE recycler. When he
asked to see the cost records for some kind of independent
verification, however, his request was denied. Becker was
informed that such information was proprietary and secret, and
that he would just have to take PI's representations as true.
Although PI claimed that all of its information was a trade
secret, and that it never obtained patents on any of its
machines, PI had in fact obtained numerous patents prior to the
recycling transactions and had also applied for a trademark for
the Sentinel recyclers. Becker decided to accept PI's
representations after speaking with Miller (the corporate counsel
to PI), Canno (who had never been to PI's plant or seen a

Sentinel EPE recycler), and a surrogate judge from Rhode Island who did business in the Boston-Cape Cod area (and who had no expertise in engineering or plastics materials). Becker testified that he was allowed to see PI's internal accounting controls regarding the allocation of royalty payments and PI's recordkeeping system in general. In Provizer v. Commissioner, supra, this Court found that "PI had no cost accounting system or records."

Becker confirmed at trial that he relied on the offering materials and discussions with PI personnel to establish the value and purported uniqueness of the recyclers. Becker testified that he relied upon the reports of Ulanoff and Burstein contained in the offering materials, despite the fact: (1) Ulanoff's report did not contain any hard data to support his opinion; (2) Ulanoff was not an economics or plastics expert; (3) Becker did not know whether Burstein was an engineer; and (4) Burstein was a client of Miller's and was not an independent expert. In addition, Ulanoff and Burstein each owned an interest in more than one partnership that owned Sentinel recyclers as part of the Plastics Recycling program.

Becker explained at trial that in the course of his practice when evaluating prospective investments for clients, he focuses on the economics of the transaction and investigates whether there is a need or market for the product or service. With

respect to the Partnership transactions the records indicate that Becker overlooked several red flags regarding the economic viability and market for the Sentinel EPE recyclers.  The offering memoranda for the Partnership transactions warned that there was no established market for the Sentinel EPE recyclers.  Becker never saw any marketing plans for selling the pellets or leasing the recyclers.  He accepted representations by PI personnel that they would be marketing the recyclers to clients and that there was a sufficient base of end-users for the machines, yet he never saw PI's client list.  At the time of the closing of the Partnerships, Becker did not know who the end-users were or if there were any end-users actually committed to the transaction.

Becker purportedly checked the price of the pellets by reading trade journals of the plastics industry.  However, he did not use those same journals to investigate the recyclers' purported value or to see whether there were any advertisements for comparable machines.  The records in these cases do not indicate that petitioners or their advisers other than Becker asked to see those journals for their own examination.  In concluding that the Partnerships would be economically profitable, Becker made two assumptions that he concedes were unsupported by any hard data:  (1) That there was a market for the pellets; and (2) that market demand for them would increase.

Becker plainly had a financial interest in SAB Reclamation, and the SAB recycling transactions generally. Becker received fees in excess of $500,000 with respect to the SAB Recycling Partnerships, $110,000 of which derived from SAB Reclamation. Becker also received fees for investment advice from some individual investors, though not from petitioners herein. In addition, Becker Co. received fees from the SAB Recycling Partnerships for preparing their partnership returns. As Becker himself testified, potential investors could not have read the offering materials and been ignorant of the financial benefits accruing to him.

### d. Conclusion as to Petitioners' Alleged Reliance on Becker

Petitioners in these cases are well educated and accomplished engineers, successful businessmen, and sophisticated investors. Grelsamer and Morgan earned engineering degrees respectively from RPI and MIT. Morgan applied his engineering skills in the production of munitions and later owned and operated his own business making components, assemblies, and subassemblies for engine manufacturers in the aircraft industry, including United Technology and Lockheed. Grelsamer's engineering education and ability resulted in his obtaining employment at Carrier, which he described as "the leading air conditioning and refrigeration corporation in the United States, if not the world," and several years later he became a

professional money manager.  Beginning in the early 1970's, petitioners combined their talents and together they began organizing and syndicating oil drilling ventures.  Morgan estimated that they drilled about 10 to 15 wells a year in the mid to late 1970's.  Because of their investment acumen and thorough, cautious approach, petitioners' oil drilling ventures yielded a 90- to 95-percent success rate.  Certainly petitioners possessed the engineering and financial intellect, skills, experience, and resources to investigate properly the viability of the Plastics Recycling transactions either themselves or by employing an independent, qualified expert.

Petitioners claim that they relied on Becker for the bona fides and viability of the Partnership transactions.  Yet Becker's expertise was in taxation, not plastics materials or plastics recycling, and his investigation and analysis of the Plastics Recycling transactions reflected this circumstance. Petitioners knew that Becker was not an engineer or expert in plastics materials or plastics recycling.  Grelsamer even testified that because Becker was not an engineer his visit to PI could not have meant much to him and that Grelsamer was sure that it did not.  Moreover, Becker testified that he was very careful not to mislead any of his clients regarding the particulars of his investigation.  As he put it:  "I don't recall saying to a client I did due diligence * * * [Rather,] I told [my clients]

precisely what I had done to investigate or analyze the transaction. I didn't just say I did due diligence, and leave it open for them to define what I might or might not have done."

The purported value of the Sentinel EPE recycler generated the deductions and credits in these cases, and that circumstance was reflected in the offering memoranda. Certainly Becker recognized the nature of the tax benefits and, given their education and professional experience, petitioners should have recognized it as well. Yet neither petitioners nor Becker verified the purported value of the Sentinel EPE recycler. Becker confirmed at trial that he relied on PI for the value of the Sentinel EPE recyclers.

Investors as technologically and financially sophisticated as petitioners either learned or should have learned the source and shortcomings of Becker's valuation information when he "precisely" disclosed "what [he] had done to investigate or analyze the transaction." Grelsamer knew that Becker was not qualified to perform an on-site evaluation of the recycler and Morgan knew from experience "what specialized equipment or machinery costs". Accordingly, we find that petitioners did not reasonably or in good faith rely on Becker as an expert or a qualified professional working in the area of his expertise to establish the fair market value of the Sentinel EPE recycler and economic viability of the Partnership transactions. Becker never

assumed such responsibility, and he fully described the particulars of his investigation, taking care not to mischaracterize it as "due diligence."

In the end, Becker and petitioners relied on PI personnel for the value of the Sentinel EPE recyclers and the economic viability of the Partnership transactions. See <u>Vojticek v. Commissioner</u>, T.C. Memo. 1995-444, to the effect that advice from such persons "is better classified as sales promotion." A taxpayer may rely upon his adviser's expertise (in these cases, accounting and tax advice), but it is not reasonable or prudent to rely upon a tax adviser regarding matters outside of his field of expertise or with respect to facts that he does not verify. See <u>David v. Commissioner</u>, 43 F.3d at 789-790; <u>Goldman v. Commissioner</u>, 39 F.3d at 408; <u>Skeen v. Commissioner</u>, 864 F.2d 93 (9th Cir. 1989), affg. <u>Patin v. Commissioner</u>, 88 T.C. 1086 (1987); <u>Lax v. Commissioner</u>, T.C. Memo. 1994-329; <u>Sacks v. Commissioner</u>, T.C. Memo. 1994-217; <u>Rogers v. Commissioner</u>, T.C. Memo. 1990-619; see also <u>Zenkel v. Commissioner</u>, T.C. Memo. 1996-398, <u>Estate of Busch v. Commissioner</u>, T.C. Memo. 1996-342; <u>Spears v. Commissioner</u>, T.C. Memo. 1996-341, with respect to Becker's advice in Plastics Recycling cases.

### 3. The Private Offering Memoranda

In addition to purportedly relying on Becker, Green, and their respective tax return preparers, petitioners maintain that

they reasonably relied upon the offering memoranda and the tax opinion letter appended thereto.  However, petitioners' testimony and actions indicate that they did not thoroughly review or study all of the information set out in the offering memoranda and that they ultimately did not place a great deal of reliance, if any, on the representations therein.

The offering memoranda included numerous caveats and warnings with respect to the Partnerships, including:  (1) The substantial likelihood of audit by the IRS and a likely challenge of the purported value of the recyclers; (2) the general partners' lack of experience in marketing recycling or similar equipment; (3) the lack of an established market for the recyclers; and (4) uncertainties regarding the market prices for virgin resin and the possibility that recycled pellets would not be as marketable as virgin pellets.  In addition, the offering memoranda noted a number of conflicts of interest, including Miller's interest in F & G Corp. and his representation of Burstein, PI, and Grant.  A careful consideration of the materials in the offering memoranda in these cases, especially the discussions of high writeoffs and risk of audit, should have alerted a prudent and reasonable investor to the questionable nature of the promised deductions and credits.  See Collins v. Commissioner, 857 F.2d 1383, 1386 (9th Cir. 1988), affg. Dister v. Commissioner, T.C. Memo. 1987-217; Sacks v. Commissioner,

supra.  Indeed, Grelsamer testified that when he reviewed the SAB Reclamation offering memorandum he thought that the "mathematics looked terribly good, maybe too good."

In each case, the projected tax benefits in the offering memoranda exceeded petitioners' respective investments. According to the offering memoranda, for each $50,000 investor, the projected first-year tax benefits were investment tax credits in excess of $82,500 plus deductions in excess of $40,000. Specifically, the projected investment tax credits and deductions for the Partnerships in the first year of the investment, for each $50,000 investor, were as follows:  $82,639 and $40,376, respectively, for Plymouth in 1981, and $83,712 and $40,234, respectively, for SAB Reclamation in 1982.

For Grelsamer's gross $25,000 investment, the Grelsamers claimed an operating loss in the amount of $20,050 and investment tax and business energy credits in the amount of $41,856 for taxable year 1982.  As a result of his $50,000 investment, Morgan claimed a $40,554 operating loss and $82,526 in investment tax and business energy credits for taxable year 1981.  The direct reductions in petitioners' Federal income tax, from the investment tax credits alone, ranged from 165 percent to 167 percent of their cash investments, without taking into consideration any rebated commissions or advance royalty payments.  Therefore, after adjustments of withholding, estimated

tax, or final payment, like the taxpayers in <u>Provizer v. Commissioner</u>, T.C. Memo. 1992-177, "except for a few weeks at the beginning petitioners [Grelsamer and Morgan] never had any money in the * * * [Partnership transactions]." In view of the disproportionately large tax benefits claimed on petitioners' 1981 and 1982 Federal income tax returns, relative to the dollar amounts invested, further investigation of the Partnership transactions clearly was required. A reasonably prudent person would have asked a qualified independent tax adviser if this windfall were not too good to be true. <u>McCrary v. Commissioner</u>, 92 T.C. 827, 850 (1989). A reasonably prudent person would not conclude without substantial investigation that the Government was providing tax benefits so disproportionate to the taxpayers' investment of their own capital.

Petitioners' reliance upon the Court of Appeals for the Ninth Circuit's partial reversal of our decision in <u>Osterhout v. Commissioner</u>, T.C. Memo. 1993-251, affd. in part and revd. in part without published opinion sub nom. <u>Balboa Energy Fund 1981 v. Commissioner</u>, 85 F.3d 634 (9th Cir. 1996), is misplaced. In <u>Osterhout</u>, on which petitioners rely, we found that certain oil and gas partnerships were not engaged in a trade or business and sustained respondent's imposition of the negligence additions to tax with respect to one of the partners therein.[3] The Court of

---

[3]   <u>Osterhout v. Commissioner</u>, T.C. Memo. 1993-251, affd. in
                                        (continued...)

Appeals for the Ninth Circuit reversed our imposition of the negligence additions to tax.  Petitioners point out that the taxpayer in that case relied in part upon a tax opinion contained in the offering materials.  However, the offering memoranda for the Partnerships herein warned prospective investors that the accompanying tax opinion letters were not in final form, and were prepared for the general partner, and that prospective investors should consult their own professional advisers with respect to the tax benefits and tax risks associated with the Partnerships. The tax opinion letter accompanying the SAB Reclamation offering memorandum was addressed solely to the general partner and began with the following disclaimer:

> This opinion is provided to <u>you for your individual guidance</u>.  <u>We expect that prospective investors will rely upon their own professional advisors</u> with respect to all tax issues arising in connection with an investment in the Partnership and the operations thereof.  We recognize that you intend to include this letter with your offering materials and we have consented to that with the understanding that <u>the purpose in distributing it is</u> to assist your offerees' and their tax advisors in making their own analysis and <u>not to permit any prospective investor to rely upon our advice in this matter</u>.  [Emphasis added.]

---

[3](...continued)
part and revd. in part without published opinion sub nom. <u>Balboa Energy Fund 1981 v. Commissioner</u>, 85 F.3d 634 (9th Cir. 1996), involved a group of consolidated cases.  The parties therein agreed to be bound by the Court's opinion regarding the application of the additions to tax under sec. 6653(a), inter alia.  Accordingly, although the Court's analysis focused on one taxpayer, the additions to tax were sustained with respect to all of the taxpayers.

A similar disclaimer appears in the tax opinion letter accompanying the Plymouth offering memorandum. Accordingly, the tax opinion letters expressly indicate that prospective investors such as petitioners were not to rely upon the tax opinion letter. See Collins v. Commissioner, supra. The limited, technical opinion of tax counsel expressed in these letters was not designed as advice upon which taxpayers might rely and the opinion of counsel itself so states.

### 4. Miscellaneous

The parties in these consolidated cases stipulated that the fair market value of a Sentinel EPE recycler in 1981 and 1982 was not in excess of $50,000. Notwithstanding this concession, petitioners contend that they were reasonable in claiming credits on their Federal income tax returns based upon each recycler's having a value of $1,162,666. In support of this position, petitioners submitted into evidence preliminary reports prepared for respondent by Ernest D. Carmagnola (Carmagnola), the president of Professional Plastic Associates. Carmagnola had been retained by the IRS in 1984 to evaluate the Sentinel EPE and EPS recyclers in light of what he described as "the fantastic values placed on the [recyclers] by the owners." Based on limited information available to him at that time, Carmagnola preliminarily estimated that the value of the Sentinel EPE recycler was $250,000. However, after additional information

became available to him, Carmagnola concluded in a signed affidavit, dated March 16, 1993, that the machines actually had a fair market value of not more than $50,000 each in the fall of 1981 and 1982.

We accord no weight to the Carmagnola reports submitted by petitioners. The projected valuations therein were based on inadequate information, research, and investigation, and were subsequently rejected and discredited by their author. Indeed, in one preliminary report, Carmagnola states that he has "a serious concern of actual profit" from a Sentinel EPE recycler and that to determine whether the machines actually could be profitable, he required additional information from PI. Carmagnola also indicates that in preparing the report, he did not have information available concerning research and development costs of the machines and that he estimated those costs in his valuations of the machines.

Respondent rejected the Carmagnola reports and considered them unsatisfactory for any purpose, and there is no indication in the records that respondent used them as a basis for any determinations in the notices of deficiency. Even so, petitioners' counsel obtained copies of these reports and urge that they support the reasonableness of the values reported on petitioners' returns. Not surprisingly, petitioners did not call Carmagnola to testify in these cases, but preferred instead to

rely solely upon his preliminary, ill-founded valuation estimates. Carmagnola has not been called to testify in any of the Plastics Recycling cases before us. See <u>Bresler v. Commissioner</u>, 65 T.C. at 188; <u>Pollack v. Commissioner</u>, 47 T.C. at 108; <u>Wichita Terminal Elevator Co. v. Commissioner</u>, 6 T.C. at 1165. The Carmagnola reports were a part of the record considered by this Court and reviewed by the Sixth Circuit Court of Appeals in the <u>Provizer</u> case, where we held the taxpayers negligent. Consistent therewith, we find in these cases, as we have found previously, that the reports prepared by Carmagnola are unreliable and of no consequence. Petitioners are not relieved of the negligence additions to tax based on the preliminary reports prepared by Carmagnola.

Petitioners' reliance on <u>Reile v. Commissioner</u>, T.C. Memo. 1992-488, and <u>Davis v. Commissioner</u>, T.C. Memo. 1989-607, is misplaced. This Court declined to sustain the negligence additions to tax in the <u>Reile</u> and <u>Davis</u> cases for reasons inapposite to the facts herein. In the <u>Davis</u> case, the taxpayers reasonably relied upon a "trusted and long-term adviser" who was independent of the investment venture, and the offering materials reviewed by the taxpayers did not reflect that the principals in the venture lacked experience in the pertinent line of business. In the <u>Reile</u> case, the taxpayers, a married couple, had only 1 year of college between them and characterized themselves as

financial "dummies." In contrast to those cases, petitioners herein are well educated, sophisticated, and successful businessmen. Becker and Green were not long-term advisers of petitioners. Green was an investor in the oil drilling ventures, and he recommended the appropriate legal structure for the ventures. However, there is no showing in the records that Green acted as a tax or investment adviser to petitioners. As for petitioners' tax return preparers, the records fail to show their qualifications to analyze the Partnership transactions, what they did, and the subject of their advice, if any. In addition, the offering memoranda disclosed that the Partnerships had no prior operating history and that the general partner had no prior experience in marketing recycling or similar equipment.

Petitioners' position is not supported by Mollen v. United States, 72 AFTR 2d 93-6443, 93-2 USTC par. 50,585 (D. Ariz. 1993). In Mollen, the taxpayer was a medical doctor who specialized in diabetes and who, on behalf of the Arizona Medical Association, led a continuing medical education (CME) accreditation program for local hospitals. The underlying tax matter involved the taxpayer's investment in Diabetics CME Group, Ltd., a limited partnership that invested in the production, marketing, and distribution of medical educational video tapes. The District Court found that the taxpayer's personal expertise and insight in the underlying investment gave him every reason to

believe it would be economically profitable.  Although the taxpayer was not experienced in business or tax matters, he did consult with an accountant and a tax lawyer regarding those matters.  Moreover, the District Court noted that the propriety of the taxpayer's disallowed deduction therein was "reasonably debatable."  Id.

Neither petitioners nor Becker had any education, special qualifications, or professional skills in plastics recycling or plastics materials.  Grelsamer was keenly aware of this and certainly Morgan did not believe otherwise.  None of them had any personal insight or industry know-how in plastics recycling that would reasonably lead them to believe that the Plastics Recycling transactions would be economically profitable.  Becker and petitioners relied upon representations by insiders to the Plastics Recycling transactions, and neither he nor petitioners hired any independent experts in the field of plastic materials or plastics recycling.  Becker purportedly discussed the transactions with Canno, who apparently was familiar with the plastics industry, but Canno was not hired by Becker to investigate PI and the Sentinel EPE recycler, never saw a Sentinel EPE recycler, and never prepared any kind of formal, written analysis of the venture.  Accordingly, we consider petitioners' arguments with respect to the Mollen case inapplicable under the circumstances of these cases.

Petitioners also rely on two recent decisions by the Court of Appeals for the Fifth Circuit that reversed this Court's imposition of the negligence additions to tax in non-plastics cases:  Durrett v. Commissioner, 71 F.3d 515 (5th Cir. 1996), affg. in part and revg. in part T.C. Memo. 1994-179; Chamberlain v. Commissioner, 66 F.3d 729 (5th Cir. 1995), affg. in part and revg. in part T.C. Memo. 1994-228.  The taxpayers in the Durrett and Chamberlain cases were among thousands who invested in the First Western tax shelter program involving alleged straddle transactions of forward contracts.  In the Durrett and Chamberlain cases, the Court of Appeals for the Fifth Circuit concluded that the taxpayers reasonably relied upon professional advice concerning tax matters.

In other First Western cases, however, the Courts of Appeals have affirmed decisions of the Tax Court imposing the negligence additions to tax.  See Chakales v. Commissioner, T.C. Memo. 1994-408 (reliance on long-term adviser, who was a tax attorney and accountant, and who in turn relied on a promoter of the venture, held unreasonable), affd. 79 F.3d 726 (8th Cir. 1996); Kozlowski v. Commissioner, T.C. Memo. 1993-430 (reliance on adviser held unreasonable absent a showing that the adviser understood the transaction and was qualified to give an opinion whether it was bona fide), affd. without published opinion 70 F.3d 1279 (9th Cir. 1995); Freytag v. Commissioner, 89 T.C. 849 (1987) (reliance

on tax advice given by attorneys and C.P.A.'s held unreasonable absent a showing that the taxpayers consulted any experts regarding the bona fides of the transactions), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991).  Here we have found that none of the advisers consulted by petitioners possessed sufficient knowledge of the plastics recycling business to render a competent opinion.  See David v. Commissioner, 43 F.3d 788, 789-790 (2d Cir. 1995) (taxpayers' reliance on expert advice not reasonable where expert lacks knowledge of business in which taxpayers invested); Goldman v. Commissioner, 39 F.3d 402, 408 (2d Cir. 1994) (same).  Accordingly, petitioners will not be relieved of the negligence additions to tax based upon the decisions in the Durrett and Chamberlain cases by the Court of Appeals for the Fifth Circuit.[4]

5.  Conclusion as to Negligence

Under the circumstances of these cases, petitioners failed to exercise due care in claiming large deductions and tax credits with respect to the Partnerships on their Federal income tax returns.  Petitioners did not reasonably rely upon the offering memoranda, Becker, Green, or their tax return preparers, or in

---

[4]     Other cases cited by petitioners are inapplicable and distinguishable for the following general, nonexclusive reasons: (1) They involve far less sophisticated, if not unsophisticated, taxpayers; (2) the reasonableness of the respective taxpayers' reliance on expert advice was established in those cases on grounds that do not exist here; and (3) the advice given was within the adviser's area of expertise.

good faith investigate the underlying viability, financial structure, and economics of the Partnership transactions. We are unconvinced by the claim of these experienced engineers and highly sophisticated, able, and successful businessmen that they reasonably failed to inquire about their investments and simply relied on the offering circulars and on Green, their tax return preparers, and ultimately Becker, despite warnings in the offering circulars and explanations by Becker about the limitations of his investigation. In each case, these taxpayers knew or should have known better. We hold, upon consideration of the entire records, that petitioners are liable for the negligence additions to tax under the provisions of section 6653(a) for the taxable years at issue. Respondent is sustained on this issue.

B.  Section 6659--Valuation Overstatement

Respondent determined that petitioners are each liable for the section 6659 addition to tax on the portion of their respective underpayments attributable to valuation overstatement. Petitioners have the burden of proving that respondent's determinations of these section 6659 additions to tax are erroneous. Rule 142(a); Luman v. Commissioner, 79 T.C. at 860-861.

A graduated addition to tax is imposed when an individual has an underpayment of tax that equals or exceeds $1,000 and "is

attributable to" a valuation overstatement. Sec. 6659(a), (d).
A valuation overstatement exists if the fair market value (or
adjusted basis) of property claimed on a return equals or exceeds
150 percent of the amount determined to be the correct amount.
Sec. 6659(c). If the claimed valuation exceeds 250 percent of
the correct value, the addition is equal to 30 percent of the
underpayment. Sec. 6659(b).

Petitioners claimed tax benefits, including an investment
tax credit and a business energy credit, based on purported
values of $1,162,666 for each Sentinel EPE recycler. Petitioners
concede that the fair market value of a Sentinel EPE recycler in
1981 and 1982 was not in excess of $50,000. Therefore, if
disallowance of petitioners' claimed tax benefits is attributable
to such valuation overstatements, petitioners are liable for the
section 6659 addition to tax at the rate of 30 percent of the
underpayment of tax attributable to the tax benefits claimed with
respect to the Partnerships.

Petitioners contend that section 6659 does not apply in
their cases for the following reasons: (1) Disallowance of the
claimed tax benefits was attributable to other than a valuation
overstatement; (2) petitioners' concessions of the claimed tax
benefits precludes imposition of the section 6659 additions to
tax; and (3) respondent erroneously failed to waive the section

6659 addition to tax.  We reject each of these arguments in these cases for reasons set forth below.

1.  The Grounds for Petitioners' Underpayments

Section 6659 does not apply to underpayments of tax that are not "attributable to" valuation overstatements.  See McCrary v. Commissioner, 92 T.C. 827 (1989); Todd v. Commissioner, 89 T.C. 912 (1987), affd. 862 F.2d 540 (5th Cir. 1988).  To the extent taxpayers claim tax benefits that are disallowed on grounds separate and independent from alleged valuation overstatements, the resulting underpayments of tax are not regarded as attributable to valuation overstatements.  Krause v. Commissioner, 99 T.C. 132, 178 (1992) (citing Todd v. Commissioner, supra).  However, when valuation is an integral factor in disallowing deductions and credits, section 6659 is applicable.  See Illes v. Commissioner, 982 F.2d 163, 167 (6th Cir. 1992), affg. T.C. Memo. 1991-449; Gilman v. Commissioner, 933 F.2d 143, 151 (2d Cir. 1991) (section 6659 addition to tax applies if a finding of lack of economic substance is "due in part" to a valuation overstatement), affg. T.C. Memo. 1989-684; Masters v. Commissioner, T.C. Memo. 1994-197, affd. without published opinion 70 F.3d 1262 (4th Cir. 1995); Harness v. Commissioner, T.C. Memo. 1991-321.

Petitioners argue that the disallowance of the claimed tax benefits was not "attributable to" a valuation overstatement.

According to petitioners, the tax benefits were disallowed because the Partnership transactions lacked economic substance, not because of any valuation overstatements. It follows, petitioners reason, that because the "attributable to" language of section 6659 requires a direct causative relationship between a valuation overstatement and an underpayment in tax, section 6659 cannot apply to their deficiencies. Petitioners cite in support of this argument: Todd v. Commissioner, supra; Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), revg. T.C. Memo. 1988-408; Gainer v. Commissioner, 893 F.2d 225 (9th Cir. 1990), affg. T.C. Memo. 1988-416; McCrary v. Commissioner, supra.

Petitioners' argument rests on the mistaken premise that our holding that the Partnership transactions lacked economic substance was separate and independent from the overvaluation of the Sentinel EPE recyclers. To the contrary, in holding that the Partnership transactions lacked economic substance, we relied heavily upon the overvaluation of the recyclers. Overvaluation of the recyclers was an integral factor in regard to: (1) The disallowed tax credits and other benefits in these cases; (2) the underpayments of tax; and (3) our finding that the Partnership transactions lacked economic substance.

Petitioners argue that in Provizer v. Commissioner, T.C. Memo. 1992-177, we found that the Clearwater transaction lacked economic substance for reasons independent of the valuation

reported in that case.  According to petitioners, the purported value of the recyclers in the Clearwater transaction was predicated upon a projected stream of royalty income, and this Court merely rejected the taxpayers' valuation method. Petitioners misread and distort our Provizer opinion.  In the Provizer case, overvaluation of the Sentinel EPE recyclers, irrespective of the technique employed by the taxpayers in their efforts to justify the overvaluation, was the dominant factor that led us to hold that the Clearwater transaction lacked economic substance.  Likewise, overvaluation of the Sentinel EPE recyclers in these cases is the ground for our holding herein that the Partnership transactions lacked economic substance.

Moreover, a virtually identical argument was recently rejected in Gilman v. Commissioner, supra, by the Court of Appeals for the Second Circuit.  In the Gilman case, the taxpayers engaged in a computer equipment sale and leaseback transaction that this Court held was a sham transaction lacking economic substance.  The  taxpayers therein, citing Todd v. Commissioner, supra, and Heasley v. Commissioner, supra, argued that their underpayment of taxes derived from nonrecognition of the transaction for lack of economic substance, independent of any overvaluation.  The Court of Appeals for the Second Circuit sustained imposition of the section 6659 addition to tax because overvaluation of the computer equipment contributed directly to

this Court's earlier conclusion that the transaction lacked economic substance and was a sham. Gilman v. Commissioner, supra at 151. In addition, the Court of Appeals for the Second Circuit agreed with this Court and with the Court of Appeals for the Eighth Circuit that "'when an underpayment stems from disallowed * * * investment credits due to lack of economic substance, the deficiency is * * * subject to the penalty under section 6659.'" Gilman v. Commissioner, supra at 151 (quoting Massengill v. Commissioner, 876 F.2d 616, 619-620 (8th Cir. 1989), affg. T.C. Memo. 1988-427); see also Rybak v. Commissioner, 91 T.C. 524, 566-567 (1988); Zirker v. Commissioner, 87 T.C. 970, 978-979 (1986); Donahue v. Commissioner, T.C. Memo. 1991-181, affd. without published opinion 959 F.2d 234 (6th Cir. 1992), affd. sub nom. Pasternak v. Commissioner, 990 F.2d 893 (6th Cir. 1993).

Petitioners' reliance on Gainer v. Commissioner, 893 F.2d 225 (9th Cir. 1990), Todd v. Commissioner, 862 F.2d 540 (5th Cir. 1988), and McCrary v. Commissioner, 92 T.C. 827 (1989), is misplaced. In those cases, in contrast to the consolidated cases herein, it was found that a valuation overstatement did not contribute to an underpayment of taxes. In the Todd and Gainer cases, the underpayments were due exclusively to the fact that the property in each case had not been placed in service. In the McCrary case, the underpayments were deemed to result from a concession that the agreement at issue was a license and not a

lease.  Although property was overvalued in each of those cases, the overvaluations were not the ground on which the taxpayers' liability was sustained.  In contrast, "a different situation exists where a valuation overstatement * * * is an integral part of or is inseparable from the ground found for disallowance of an item."  McCrary v. Commissioner, supra at 859.  Each of these consolidated cases presents just such a "different situation": overvaluation of the recyclers was integral to and inseparable from petitioners' claimed tax benefits and our holding that the Partnership transactions lacked economic substance.[5]

## 2.  Concession of the Deficiency

Petitioners argue that their concessions of the deficiencies preclude imposition of the section 6659 additions to tax.  Petitioners contend that their concessions render any inquiry into the grounds for such deficiencies moot.  Absent such inquiry, petitioners argue that it cannot be known whether their underpayments were attributable to a valuation overstatement or

---

[5]     To the extent that Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), revg. T.C. Memo. 1988-408, merely represents an application of Todd v. Commissioner, 89 T.C. 912 (1987), affd. 862 F.2d 540 (5th Cir. 1988), we consider it distinguishable.  To the extent that the reversal in the Heasley case is based on a concept that where an underpayment derives from the disallowance of a transaction for lack of economic substance, the underpayment cannot be attributable to an overvaluation, this Court and the Court of Appeals for the Second Circuit, and other Courts have disagreed.  See Gilman v. Commissioner, 933 F.2d 143, 151 (2d Cir. 1991) ("The lack of economic substance was due in part to the overvaluation, and thus the underpayment was attributable to the valuation overstatement.")

other discrepancy. Without a finding that a valuation overstatement contributed to an underpayment, according to petitioners, section 6659 cannot apply. In support of this line of reasoning, petitioners rely heavily upon Heasley v. Commissioner, supra, and McCrary v. Commissioner, supra.

Petitioners' open-ended concessions do not obviate our finding that the Partnership transactions lacked economic substance due to overvaluation of the recyclers. This is not a situation where we have "to decide difficult valuation questions for no reason other than the application of penalties." See McCrary v. Commissioner, supra at 854. The value of the Sentinel EPE recycler was established in Provizer v. Commissioner, T.C. Memo. 1992-177, and stipulated by the parties. As a consequence of the inflated value assigned to the recyclers by the Partnerships, petitioners claimed deductions and credits that resulted in underpayments of tax, and we held that the Partnership transactions lacked economic substance. Regardless of petitioners' concessions, in these cases the underpayments of tax were attributable to the valuation overstatements.

Moreover, concession of the investment tax credit in and of itself does not relieve taxpayers of liability for the section 6659 addition to tax. See Dybsand v. Commissioner, T.C. Memo. 1994-56; Chiechi v. Commissioner, T.C. Memo. 1993-630. Instead, the ground upon which the investment tax credit is disallowed or

conceded is significant. Even in situations in which there are arguably two grounds to support a deficiency and one supports a section 6659 addition to tax and the other does not, the taxpayer may still be liable for the addition to tax. Gainer v. Commissioner, 893 F.2d at 228; Irom v. Commissioner, 866 F.2d 545, 547 (2d Cir. 1989), vacating in part T.C. Memo. 1988-211; Harness v. Commissioner, T.C. Memo. 1991-321.

In the present cases, no argument was made and no evidence was presented to the Court to prove that disallowance and concession of the investment tax credits related to anything other than a valuation overstatement. To the contrary, petitioners each stipulated substantially the same facts concerning the Partnership transactions as we found in Provizer v. Commissioner, supra. In the Provizer case, we held that the taxpayers were liable for the section 6659 addition to tax because the underpayment of taxes was directly related to the overvaluation of the Sentinel EPE recyclers. The overvaluation of the recyclers, exceeding 2325 percent, was an integral part of our findings in Provizer that the transaction was a sham and lacked economic substance. Similarly, the records in these cases plainly show that the overvaluation of the recyclers is integral to and is the core of our holding that the underlying transactions here were shams and lacked economic substance.

Petitioners' reliance on McCrary v. Commissioner, supra, is misplaced. In that case, the taxpayers conceded disentitlement to their claimed tax benefits and the section 6659 additions to tax were held inapplicable. However, the concessions of the claimed tax benefits, in and of themselves, did not preclude imposition of the section 6659 additions to tax. In McCrary v. Commissioner, supra, the section 6659 addition to tax was disallowed because the agreement at issue was conceded to be a license and not a lease. In contrast, the records in petitioners' cases plainly show that petitioners' underpayments were attributable to overvaluation of the Sentinel EPE recyclers. We hold that petitioners' reliance on McCrary v. Commissioner, supra, is inappropriate.[6]

We held in Provizer v. Commissioner, supra, that each Sentinel EPE recycler had a fair market value not in excess of $50,000. Our holding in the Provizer case that the Sentinel EPE recyclers had been overvalued was integral to and inseparable from our holding of a lack of economic substance. Petitioners stipulated that the Partnership transactions were similar to the Clearwater transaction described in the Provizer case, and that

---

[6] Petitioners' citation of Heasley v. Commissioner, supra, in support of the concession argument is also inappropriate. That case was not decided by the Court of Appeals for the Fifth Circuit on the basis of a concession. Moreover, see supra note 5 to the effect that this Court, the Court of Appeals for the Second Circuit, and other Courts have not followed the Heasley opinion with respect to the application of sec. 6659.

the fair market value of a Sentinel EPE recycler in 1981 and 1982 was not in excess of $50,000. Given those concessions, and the fact that the records here plainly show that the overvaluation of the recyclers was the underlying reason for the disallowance of the claimed tax benefits, we conclude that the deficiencies were attributable to overvaluation of the Sentinel EPE recyclers.

### 3. Section 6659(e)

Petitioners argue that respondent erroneously failed to waive the section 6659 additions to tax. Section 6659(e) authorizes respondent to waive all or part of the addition to tax for valuation overstatements if taxpayers establish that there was a reasonable basis for the adjusted bases or valuations claimed on the returns and that such claims were made in good faith. Respondent's refusal to waive a section 6659 addition to tax is reviewable by this Court for abuse of discretion. Krause v. Commissioner, 99 T.C. at 179. Abuse of discretion has been found in situations where respondent's refusal to exercise her discretion is arbitrary, capricious, or unreasonable. See Mailman v. Commissioner, 91 T.C. 1079 (1988); Estate of Gardner v. Commissioner, 82 T.C. 989 (1984); Haught v. Commissioner, T.C. Memo. 1993-58.

We note initially that petitioners did not request respondent to waive the section 6659 additions to tax until well after the trials of these cases. Morgan made his request more than 6 months after the trial of his case, and the Grelsamers

made their request more than 4 months after the trial of their case. We are reluctant to find that respondent abused her discretion in these cases in which she was not timely requested to exercise it and where there is no direct evidence of any abuse of administrative discretion. Haught v. Commissioner, supra; cf. Wynn v. Commissioner, T.C. Memo. 1995-609; Klieger v. Commissioner, T.C. Memo. 1992-734.

However, we do not decide this issue solely on petitioners' failure timely to request waivers, but instead we have considered the issue on its merits. Petitioners urge that they relied on the respective offering materials, Becker, Green, and their tax return preparers in deciding on the valuation claimed on their tax returns. Petitioners contend that such reliance was reasonable, and, therefore, that respondent should have waived the section 6659 additions to tax. However, as we explained above in finding petitioners liable for the negligence additions to tax, petitioners' purported reliance on the offering materials and their advisers was not reasonable.

The offering materials for the Partnerships contained numerous warnings and caveats, including the likelihood that the value placed on the recyclers would be challenged by the IRS as being in excess of fair market value. Yet petitioners never sought to resolve the numerous issues raised by the offering materials. Becker possessed no special qualifications or professional skills in the recycling or plastics industries and

petitioners were not ignorant of his limitations. According to Grelsamer, the fact that Becker was not an engineer severely handicapped his ability to evaluate the recyclers when he visited PI. Grelsamer did not even think that the PI personnel could "talk to him [Becker]." Despite these obvious limitations, Becker and petitioners never hired or consulted any plastics engineering or technical experts with respect to the Plastics Recycling transactions. Becker spoke with his client, Canno, who apparently had some knowledge of the plastics industry, but the substance of Canno's purported comments is doubtful and he had only minimal information about the transaction. At trial, Becker confirmed that in the end he relied exclusively on PI, its personnel, and the offering materials as to the value and purported uniqueness of the machines. With respect to Green and petitioners' tax return preparers, the records in these cases are wholly inadequate as to their purported qualifications, investigations, if any, and advice regarding the Plastics Recycling transactions.

In support of their contention that they acted reasonably, petitioners cite Mauerman v. Commissioner, 22 F.3d 1001 (10th Cir. 1994), revg. T.C. Memo. 1993-23. However, the facts in the Mauerman case are distinctly different from the facts of these cases. In Mauerman, the Tenth Circuit Court of Appeals held that the Commissioner had abused her discretion by not waiving a section 6661 addition to tax. Like section 6659, a section 6661

addition to tax may be waived by the Commissioner if the taxpayer demonstrates that there was reasonable cause for his underpayment and that he acted in good faith.  Sec. 6661(c).  The taxpayer in Mauerman relied upon independent attorneys and accountants for advice as to whether payments were properly deductible or capitalized.  The advice relied upon by the taxpayer in Mauerman was within the scope of the advisers' expertise, the interpretation of the tax laws as applied to undisputed facts. In these cases, particularly with respect to valuation, petitioners relied upon advice that was outside the scope of expertise and experience of their advisers.  Consequently, we consider petitioners' reliance on the Mauerman case inapplicable.

We hold that petitioners did not have a reasonable basis for the adjusted bases or valuations claimed on their tax returns with respect to their investments in the Partnerships.  In these cases, respondent could find that petitioners' respective reliance on the offering materials, Becker, Green, and their tax return preparers was unreasonable.  The records in these cases do not establish an abuse of discretion on the part of respondent but support respondent's position.  We hold that respondent's refusal to waive the section 6659 addition to tax is not an abuse of discretion.  Petitioners are liable for the respective section 6659 additions to tax at the rate of 30 percent of the underpayments of tax attributable to the disallowed tax benefits. Respondent is sustained on this issue.

C.  Petitioners' Motions For Leave To File Motion for Decision
Ordering Relief From the Negligence Penalty and the Penalty Rate
of Interest and To File Supporting Memorandum of Law

Long after the trials of these cases, petitioners each filed a Motion For Leave To File Motion for Decision Ordering Relief From the Negligence Penalty and the Penalty Rate of Interest and To File Supporting Memorandum of Law under Rule 50.  Petitioners also lodged with the Court motions for decision ordering relief from the additions to tax for negligence and from the increased rate of interest, with attachments, and memoranda in support of such motions.  Respondent filed objections, with attachments, and memoranda in support thereof and petitioners thereafter filed reply memoranda.  Petitioners argue that they should be afforded the same settlement that was reached between other taxpayers and the IRS in Miller v. Commissioner docket Nos. 10382-86 and 10383-86.  See Farrell v. Commissioner, T.C. Memo. 1996-295 (denying a motion similar to petitioners' motions); see also Zenkel v. Commissioner, T.C. Memo. 1996-398.

Counsel for petitioners seek to raise a new issue long after the trials in these cases.  Resolution of such issue might well require new trials.  Such further trials "would be contrary to the established policy of this Court to try all issues raised in a case in one proceeding and to avoid piecemeal and protracted litigation."  Markwardt v. Commissioner, 64 T.C. 989, 998 (1975); see also Robin Haft Trust v. Commissioner, 62 T.C. 145, 147 (1974).  Consequently, under the circumstances here, at this late

date in the litigation proceedings, long after trial and briefing and after the issuance of numerous opinions on issues and facts closely analogous to those in these cases, petitioners' motions for leave are not well founded.  Farrell v. Commissioner, supra.

Even if petitioners' motions for leave were granted, the arguments set forth in each of petitioners' motions for decision and attached memoranda, lodged with this Court, are invalid and such motions would be denied.  Therefore, and for reasons set forth in more detail below, petitioners' motions for leave shall be denied.

Some of our discussion of background and circumstances underlying petitioners' motions is drawn from documents submitted by the parties and findings of this Court in two earlier decisions.  Such matters are not disputed by the parties.  See Estate of Satin v. Commissioner, T.C. Memo. 1994-435; Fisher v. Commissioner, T.C. Memo. 1994-434.  The Estate of Satin and Fisher cases involved Stipulation of Settlement agreements (piggyback agreements) made available to taxpayers in the Plastics Recycling project, whereby taxpayers could agree to be bound by the results of three test cases:  Provizer v. Commissioner, T.C. Memo. 1992-177, and the two Miller cases.  We held in Estate of Satin and Fisher that the terms of the piggyback agreement bound the parties to the results in all three lead cases, not just the Provizer case.  Petitioners assert that the piggyback agreement was extended to them, but they do not

claim to have accepted the offer timely, so they effectively rejected it. We discuss the background matters, apparently not disputed by the parties, for the sake of completeness. As we have noted, granting petitioners' motions for leave would require further proceedings.

On or about February 1988, a settlement offer (the Plastics Recycling project settlement offer or the offer) was made available by respondent in all docketed Plastics Recycling cases, and subsequently in all nondocketed cases. Baratelli v. Commissioner, T.C. Memo. 1994-484.[7] Pursuant to the offer, taxpayers had 30 days to accept the following terms: (1) Allowance of a deduction for 50 percent of the amount of the cash investment in the venture in the year(s) of investment to the extent of loss claimed; (2) Government concession of the substantial understatement of tax penalties under section 6661 and the negligence additions to tax under section 6653(a)(1) and (2); (3) taxpayer concession of the section 6659 addition to tax for valuation overstatement and the increased rate of interest under section 6621; and (4) execution of a closing agreement (Form 906) stating the settlement and resolving the entire matter for all years. Petitioners assert that the Plastics Recycling

---

[7]     Although the records do not include a settlement offer to petitioners, petitioners have attached to their motions for decision a copy of a settlement offer to another taxpayer with respect to a plastics recycling case, and respondent has not disputed the accuracy of the statement of the plastics recycling settlement offer.

project settlement offer was extended to them, but they do not claim to have accepted the offer timely, so they effectively rejected it.

In December 1988, the <u>Miller</u> cases were disposed of by settlement agreement between the taxpayers and respondent.[8] This Court entered decisions based upon those settlements on December 22, 1988.  The settlement provided that the taxpayers in the <u>Miller</u> cases were liable for the addition to tax under section 6659 for valuation overstatement, but not for the additions to tax under sections 6661 and 6653(a).  The increased interest under section 6621(c), premised solely upon Miller's interest in the recyclers for the taxable years at issue, was not applicable because Miller made payments prior to December 31, 1984, so no interest accrued after that time.  Respondent did not notify petitioners or any other taxpayers of the disposition of the <u>Miller</u> cases.  <u>Estate of Satin v. Commissioner</u>, <u>supra</u>; <u>Fisher v. Commissioner</u>, <u>supra</u>.

Petitioners argue that they are similarly situated to Miller, the taxpayer in the <u>Miller</u> cases, and that pursuant to the principle of "equality" they are therefore entitled to the same settlement agreement executed by respondent and Miller in

---

[8]    Although it is not otherwise a part of the record in these cases, respondent attached copies of the <u>Miller</u> closing agreement and disclosure waiver to her objection to petitioners' motion for leave, and petitioners do not dispute the accuracy of the document.

those cases.  In effect, petitioners seek to resurrect the piggyback agreement offer and/or the settlement offer they previously failed to accept.

Petitioners contend that under the principle of "equality," the Commissioner has a duty of consistency toward similarly situated taxpayers and cannot tax one and not tax another without some rational basis for the difference.  United States v. Kaiser, 363 U.S. 299, 308 (1960) (Frankfurter, J., concurring opinion); see Baker v. United States, 748 F.2d 1465 (11th Cir. 1984); Farmers' & Merchants' Bank v. United States, 476 F.2d 406 (4th Cir. 1973).  According to petitioners, the principle of equality precludes the Commissioner from making arbitrary distinctions between like cases.  See Baker v. Commissioner, 787 F.2d 637, 643 (D.C. Cir. 1986), vacating 83 T.C. 822 (1984).

The different tax treatment accorded petitioners and Miller was not arbitrary or irrational.  While petitioners and Miller both invested in the Plastics Recycling project, their actions with respect to such investments provide a rational basis for treating them differently.  Miller foreclosed any potential liability for increased interest in his cases by making payment of the tax prior to December 31, 1984; no interest accrued after that date.  In contrast, petitioners made no such payment and they conceded that the increased rate of interest under section 6621(c) applies in their cases.  Liability for the increased rate of interest is the principal difference between the settlement in

the Miller cases, which petitioners declined when they failed to accept the piggyback agreement offer, and the settlement offer that petitioners also failed to accept.

Petitioners argue that section 6621(c) must have been an issue in the Miller cases since each of the decisions in Miller recites "That there is no increased interest due from the petitioner[s] for the taxable years [at issue] under the provisions of IRC section 6621(c)."  According to petitioners, "if the Millers were not otherwise subject to the penalty interest provisions because of the particular timing of their tax payments, there would have been no need for the Court to include such a recital in its decisions."  This argument by petitioners is entirely conjectural and is not supported by the documentation on which counsel relies.  In fact, the recital that no increased interest under section 6621(c) was due in the Miller cases was an express term of the settlement documents in those cases and apparently included in the decisions for completeness and accuracy.  There is nothing on the record in the present cases, or in the Court's opinions in Estate of Satin v. Commissioner, T.C. Memo. 1994-435, or Fisher v. Commissioner, T.C. Memo. 1994-434, or in any of the material submitted to us in these cases that would indicate that the Millers were "otherwise subject to the penalty interest provisions".  Petitioners' argument is based on a false premise.

We find that petitioners and Miller were treated equally to the extent they were similarly situated, and differently to the extent they were not. Miller foreclosed the applicability of the section 6621(c) increased rate of interest in his cases, while petitioners concede it applies in their cases. Petitioners failed to accept a piggyback settlement offer that would have entitled them to the settlement reached in the <u>Miller</u> cases, and also did not enter into a settlement offer made to them prior to trial of a test case. In contrast, Miller negotiated and accepted an offer that was essentially the same as the Plastics Recycling project settlement offer rejected by petitioners prior to trial. Accordingly, petitioners' motions are not supported by the principle of equality on which they rely. Cf. <u>Baratelli v. Commissioner</u>, T.C. Memo. 1994-484.

In order to reflect the foregoing,

> <u>Appropriate orders will be issued denying petitioners' motions, and decisions will be entered under Rule 155</u>.